UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JIM KALTENBACHER and JAG GILL, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>HILLCREST HEALTHCARE SYSTEM, )<br>)<br>Defendant. ) | Case No. 05-CV-0508-CVE-FHM |

## OPINION AND ORDER

Plaintiffs Jim Kaltenbacher ("Kaltenbacher") and Jag Gill ("Gill") filed this action to recover termination benefits from defendant Hillcrest Healthcare System ("Hillcrest"). Dkt. # 44. Plaintiffs argue that they are entitled to severance pay under Hillcrest's Executive Severance Policy ("Policy") when Hillcrest sold its assets to Ardent Health Services ("Ardent"). Defendant argues that plaintiffs are not entitled to termination benefits under the Policy.

**I.**

Gill and Kaltenbacher became executive employees at Hillcrest on February 26, 1997 and March 17, 1998, respectively. Kaltenbacher assumed the position of Executive Director/Regional for Hillcrest. Dkt. # 34, Ex. 2. Gill assumed the position of Executive Director. Dkt. # 34, Ex. 3. Both Kaltenbacher and Gill held executive positions with the title of Vice President or above; thus, they were covered by the Policy.

The Policy "covers cases in which Hillcrest HealthCare System has determined that eligible participants' services are no longer required (whether through merger, reengineering, or other reasons which are 'without cause' for poor performance). No severance will be paid if an eligible participants [sic] resigns. If an eligible participant is terminated due to documented poor performance, (not involving illegal or unethical activities), Hillcrest HealthCare System will

continue salary and full benefits for 30 days after the date of termination. No severance will be given in termination cases involving illegal or unethical activities." Dkt. # 34, Ex. 1. The Policy further provides, "The Chief Executive is authorized to grant case by case exceptions to the above eligibility if, in his judgment, it is in the best interest of Hillcrest HeathCare System, such exception to be documented in the confidential personnel file of the affected executive." Id. Kaltenbacher and Gill's employment letters contained identical provisions concerning their termination benefits:

> In the event of a non-performance related termination resulting from reduction in workforce or changes in management, you would be kept on the Hillcrest payroll with full benefits for six months and core benefits for an additional three months in accordance with the Executive Severance Policy. Should termination be for performance reasons, other than an illegal act, severance will be a minimum of one month's pay.

Dkt. # 34, Ex. 2 & 3.

In May 2004, Hillcrest announced that it was selling its assets to Ardent. Hillcrest understood that Ardent would retain a majority of the Hillcrest employees and afford them the same or similar salary with the same or similar benefits. According to the letter sent to the all Hillcrest employees discussing the asset sale:

> Upon completion of the transaction, Ardent intends to hire [Hillcrest] employees in positions and at compensation levels consistent with those currently provided. Ardent will honor employees' prior service credit for purpose of eligibility and vesting in Ardent's retirement benefit plans. In general, the same types of benefits will be offered to employees under the Ardent benefit plan, though there may be some changes in the companies that administer those benefits. Ardent's goals is to make any necessary changes as minimal as possible.

Dkt. # 34, Ex. 4. Additionally, Ardent "continute[d] to operate with the Hillcrest HealthCare System name." Dkt. # 34, Ex. 4, at 16.

On August 8, 2004, Kaltenbacher sent Don Lorack ("Lorack"), Hillcrest's President and Chief Executive Officer, an email inquiring about termination benefits as a result of the sale of assets. Dkt. # 34, Ex. 5. On August 10, 2004, Lorack responded with a letter, stating:

> I have been informed that Ardent will not be terminating your employment in connection with the upcoming transaction . . . . Naturally, if Ardent employs you in the same "at-will" capacity that Hillcrest currently employs you, Ardent will be able to make changes to your benefit plans at its discretion. However, this is not a change from your current situation at Hillcrest.

Dkt. # 34, Ex. 6.

It is undisputed that Kaltenbacher and Gill continued to work at Ardent after the sale of assets. They do not contend that their salary or benefits changed in any substantial way; however, they argue that they are nonetheless entitled to severance benefits under the Policy because they were "terminated" without cause from Hillcrest as a result of the sale of Hillcrest's assets to Ardent. By contrast, Hillcrest argues that plaintiffs are not entitled to severance pay as a result of Hillcrest selling its assets to Ardent because the "sale did not result in plaintiffs' employment being terminated as that term was interpreted in accordance with the Hillcrest severance plan." Dkt. # 46, at 1.

**II.**

On November 3, 2005, the Court issued an Opinion and Order finding that plaintiffs' claims are governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. ("ERISA"); therefore the case was properly removed to federal court. Dkt. # 15. Plaintiffs attempted to revisit that decision in their motion to remand, and United States Magistrate Judge

3

Frank H. McCarthy denied that motion. Dkt. # 45. The Court reiterates that this case is governed by ERISA.[1]

In ERISA cases, the Court first must determine the applicable standard of review. In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Here, the Policy contains some language that suggests that Hillcrest retains some discretion in determining eligibility. The Policy states that the Chief Executive can grant case-by-case exceptions to an executive's eligibility. Dkt. # 34, Ex. 1. However, this provision is ambiguous and does not indicate the amount of discretion that the Chief Executive has to determine an executive's participation in the Policy. Normally, to receive the more deferential arbitrary and capricious standard of review, the Plan unambiguously gives the administrator maximum deference in accordance with the law. See, e.g., Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 767 (10th Cir. 2004) (applying the arbitrary and capricious standard where the plan provided that the administrator "shall perform its duties of administration as it determines in its sole discretion"); Pitman v. Blue Cross and Blue Shield of Oklahoma, 217 F.3d 1291, 1295 (10th Cir. 2000) (applying the arbitrary and capricious standard where the plan states that "[t]he Board of Trustees of Blue Cross and Blue Shield of Oklahoma is authorized to determine, and in its discretion, to alter the Benefits provided by this Contract"). Here, the level of discretion is not sufficient to apply the arbitrary and capricious test. Indeed, defendant does not even argue that it

---

[1]  Defendants argue that "Plaintiffs have yet against used this opportunity to argue the Hillcrest severance plan is not governed by ERISA." Dkt. # 46, at 4. In fact, plaintiffs make several references to ERISA and base their argument on ERISA cases.

is entitled to deference under the arbitrary and capricious standard of review. Therefore, consistent with Bruch, the Court will apply the de novo standard of review.

### III.

While this case is governed by ERISA, the Court will apply general principles of contract construction in interpreting the Policy. According to the Tenth Circuit, "the Supreme Court has directed us to interpret an ERISA plan like any contract, by examining its language and determining the intent of the parties to the contract." Capital Cities/ABC, Inc. v. Ratcliff, 141 F.3d 1405, 1411 (10th Cir. 1998); see Bruch, 489 U.S. at 112-13, 115; Pitman, 217 F.3d at 1298 n.6. If the Policy's terms are unambiguous, then the Court will presume the natural meaning of the Policy terms to be conclusive evidence of such intent. See Awbrey v. Pennzoil Co., 961 F.2d 928, 931 (10th Cir. 1992); Bellino v. Schlumberger Technologies, Inc., 944 F.2d 26, 30 (1st Cir. 1991); Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027 (11th Cir. 1994). But if the terms are ambiguous, the Court will examine the intent of the parties and turn to extrinsic evidence. See Fuller v. FMC Corp., 4 F.3d 255, 259 (4th Cir. 1993) (finding that the ERISA policy was ambiguous as to whether the employees could receive severance pay and accordingly turning to extrinsic evidence of the plan's meaning); Allen v. Adage, Inc., 967 F.2d 695, 700 (1st Cir. 1992).

The first inquiry, therefore is whether the plan language is ambiguous. As noted above, the Policy states that employees are entitled to severance benefits in cases where "[Hillcrest] has determined that eligible participants' *services are no longer required* (whether through merger, reengineering, or other reasons which are 'without cause' for poor performance)." Dkt. # 34, Ex. 1 (emphasis added). The Court notes that both plaintiffs and defendant focus primarily on whether plaintiffs were "terminated" under the terms of the Policy. The focus on the term "terminated"

likely stems from plaintiffs' employment letters, which include the phrase "non-performance related termination." Dkt. # 34, Ex. 3. However, the Policy's language, not the employment letter language, is determinative. With respect to the Policy language, plaintiffs argue that "plaintiffs' services were no longer required by Hillcrest because it sold its assets to Ardent and ceased operating the hospital." Dkt. # 47, at 1. The sale of assets, they contend, constituted a "reason which [is] 'without cause' for poor performance." Dkt. # 34, Ex. 1.

Contrary to plaintiffs' arguments, the Court finds the Policy to be ambiguous. The Policy does not state that plaintiffs' services must no longer be required <u>by</u> <u>Hillcrest</u>; it merely states that Hillcrest must determine that a participants' services are no longer required. Whether the Policy means that participants' services must be no longer required with respect to a successor company or only with respect to Hillcrest, as it existed before the asset sale, is open to interpretation. Additionally, plaintiffs "continue[d] to operate with the Hillcrest HealthCare System name" after the sale of assets to Ardent. Dkt. # 34, Ex. 4, at 16. Thus, one could argue that plaintiffs' services were still required by "Hillcrest." Finally, it would not be unreasonable to interpret "services no longer required" to mean that participants must cease work before they can receive severance pay. Contrary to plaintiffs' argument, the parenthetical, "(whether through merger, reengineering, or other reasons which are 'without cause' for poor performance)", does little to resolve this ambiguity. While an asset sale is in the generic category of corporate acquisitions and mergers, it is still unclear whether plaintiffs must cease work at Hillcrest and/or its successor before receiving the severance benefits. Ultimately, since the Plan itself contains no elaboration of the phrase "services no longer required" and that phrase is open to differing interpretations, the Court determines that the Policy is ambiguous.

6

The fact that the Policy language is ambiguous does not mean that the Court should resolve the ambiguities in favor of the non-drafting party. On the contrary, in Bruch, the Supreme Court analogized ERISA plans to trust agreements and instructed courts to construe their terms "without deferring to either party's interpretation." Bruch, 489 U.S. at 112; see also Allen, 967 F.2d at 701. "The clear implication of Bruch is that courts should not defer to either side in interpreting severance pay plans." Allen, 967 F.2d at 701. Thus, the Court will look at the ambiguous Policy language in light of extrinsic evidence and general policy considerations, not one party's interpretation of the plan.

Before turning to the case law, the Court notes that the ambiguous nature of the Policy makes this a closer case than the three Tenth Circuit cases relied upon by defendant: Awbrey v. Pennzoil Co., 961 F.2d 928 (10th Cir. 1992); Headrick v. Rockwell Int'l Corp., 24 F.3d 1272 (10th Cir. 1994); and Garvin v. American Telephone & Telegraph Co., 174 F.3d 1087 (10th Cir. 1999). In each of those cases, the Tenth Circuit held that the plain language of the policies clearly precluded recovery of severance pay by the plaintiff-appellants. In Awbrey, the previous employer's severance policy provided for severance pay when "a permanent job has been eliminated" and "the employee has not been offered a comparable job." 961 F.2d at 929. In Headrick, the plan language provided for severance benefits for employees "permanently laid off for lack of work." 245 F.3d at 1276. Finally, in Garvin, the plan stated, "an employee LAID OFF shall be granted a Termination Allowance." 174 F.3d at 1091. It defined "laid off" as "a termination of employment arising out of a reduction in the force due to lack of work." Id. Under the plain language of the plans in these cases, it was clear that plaintiff-appellants were not entitled to severance pay because, since they were retained by their new employers, they did not suffer from a lack of work or had been offered

7

a comparable job. Here, the plan language, on its own, does not dictate the outcome. Thus, the Court agrees with plaintiffs that these Tenth Circuit cases are distinguishable, at least in terms of plan language, from the Policy in this case. Nonetheless, the Court rejects plaintiffs' argument that the Tenth Circuit opinions are "inapplicable and inapposite." Dkt. # 47, at 10. Rather, the Court determines that Awbrey, Headrick, and Garvin are highly relevant in determining the purpose of the severance plan, particularly given the ambiguous nature of the Policy itself.

In Headrick, the Court noted that allowing severance pay would undermine the "primary intention behind the provision of severance pay." 24 F.3d at 1276. "[S]everance pay is largely afforded to help former employee minimize the privations of temporary unemployment while they seek new work." Id. at 1276. The court explained,

> [M]andating payment when a transfer of control has taken place and the employee has retained his same position without interruption would in no way advance this interest; indeed, rather than softening the blow of a period of unemployment, it would only serve to provide [employees] a happy period of double income.

Id. (quoting Allen, 967 F.2d at 702); see also Awbrey, 961 F.2d at 931 (noting that since none of plaintiffs missed any work or suffered any loss of income, severance pay would be an "unjustified windfall" to the employee); Sly v. P.R. Mallory & Co., 712 F.2d 1209, 1211 ("To award severance benefits . . . would result in a windfall to the employees who retained their positions with the purchaser of the going concern); Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1350 (4th Cir. 1989) (awarding severance benefits "would seem even more of a windfall, because it would award [benefits] to persons who never changed jobs and were never out of work"); Lackey v. Remington Arms Co., 874 F.2d 541, 545 (9th Cir. 1989) (severance benefits would have been a windfall to employees where the change in employer caused no lack of work to employees).

Plaintiffs note that some circuit court cases hold that granting severance pay to employees who are retained by a new employer after a sale of assets or other management change does not constitute a windfall.  For example, in <u>Bedinghaus v. Modern Graphic Arts</u>, 15 F.3d 1027, 1030 (11th Cir. 1994), the court noted that the award of severance pay to plaintiffs "does not result in a windfall."  There, the court noted that the new employer did not give plaintiffs credit for their years service at the old employer for purposes of accruing and calculating severance pay benefits.  <u>Id.</u> at 1028.  Granting severance pay did not constitute a windfall because it rewarded plaintiffs for past service to the old company, a benefit that they lost upon their employment with the new employer.  Likewise, in <u>Anstett v. Eagle-Picher Indus., Inc.</u>, 203 F.3d 504, 506 (7th Cir. 2000), the court held that granting plaintiffs severance pay when they were retained by the new employer was not a windfall because the old employer "knew it had this obligation [to make severance payments] to its employees at the time of the sale, and presumably included this payout in determining the price to set for the division."  The court further noted that the employees "lost their severance benefits when they began working for [the new employer], which did not offer a comparable benefit."  <u>Id.</u>  Thus, the severance pay in these cases compensated plaintiffs for a benefit that they lost as a result of the change in management.

The Court finds this case comparable to <u>Headrick</u>, <u>Awbrey</u>, and the other cases denying severance benefits and distinguishable from <u>Bedinghaus</u> and <u>Anstett</u>.  As defendant points out, plaintiffs have not lost a single day's wages or any accrued seniority.  Under Ardent's employ,

9

plaintiffs have the same or substantially similar benefits as they enjoyed under Hillcrest's employ.[2]

The letter sent to all Hillcrest employees before the sale of assets stated:

> Ardent will honor employees' prior service credit for purpose of eligibility and vesting in Ardent's retirement benefit plans. In general, the same types of benefits will be offered to employees under the Ardent benefit plan, though there may be some changes in the companies that administer those benefits.

Dkt. # 34, Ex. 4. Indeed, plaintiffs never contend that they have suffered from any substantive change in benefits following the sale of assets. Given that plaintiffs enjoy comparable benefits in the employ of Ardent, any severance pay would be a "happy period of double income." Headrick, 24 F.3d at 1276.

Since the Policy is ambiguous, the Court will not read into the Policy a provision providing employees with severance pay when they retain comparable benefits under the new employer. According to the Tenth Circuit, "it 'beggars credulity' to suggest the ordinary employer would intend such an anomalous result [i.e., receiving double pay] 'without some clear indication to that effect in the plan documents.'" Headrick, 24 F.3d at 1277 (quoting Allen, 967 F.2d at 702)). Here, there is no "clear indication" in the Policy that Hillcrest intended plaintiffs to receive severance pay. Thus, the Court determines that the Policy should not be interpreted to "impute such altruistic beneficence" to Hillcrest. Allen, 967 F.2d at 702. Rather, the Court interprets the Policy to exclude severance pay for those employees who receive comparable benefits with Ardent, to be consistent with the Tenth Circuit and other courts' interpretation of severance pay plans "as forms of unemployment benefits, and not as bonus payments to be received on termination." Awbrey, 961

---

[2]  The fact that there might be minor differences in plaintiffs' benefits with Ardent and their benefits with Hillcrest does not change the Court's analysis. According to the Tenth Circuit, "comparable" does not mean "identical." Awbrey, 961 F.2d at 931. "Some differences in the benefits plans are to be expected." Id.

F.2d at 931; Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1140 (4th Cir. 1985) (unemployment compensation is the major purpose of severance pay provisions); Sly, 712 F.2d at 1211 (agreeing with the district court's determination that "[s]everance is generally intended to tide an employee over while seeking a new job and should be considered an unemployment benefit").

In determining that the Policy does not entitle plaintiffs to severance pay in this case, the Court does not purport to hold that a period of unemployment is a prerequisite to obtaining severance benefits. On the contrary, the Tenth Circuit has expressly rejected such an expansive rule. The Tenth Circuit stated in Headrick, "we should note that our conclusion here [denying severance pay] does not begin to establish some formal rule that a period of unemployment or a diminution in income or benefits is an immutable precondition to recovery of severance pay." Id. at 1277. Plaintiffs point to this quotation to support their argument that their uninterrupted employment does not prohibit the receipt of severance pay. Dkt. # 47, at 5. However, plaintiffs fail to consider the Tenth Circuit's rationale following this statement. The court explained that, under the severance policy in that case, an employee who was laid off for lack of work but who was fortunate enough to find an equivalent job soon thereafter would be entitled to severance pay. Id. at 1277. The court distinguished between an employee who was laid off and found employment and an employee who was hired immediately by the successor company:

> [E]mployees kept on by a plant owner's successor are in a different position from those who are laid off but find alternative employment. The former are not faced with the same risk of unemployment as are those who are permanently laid off because of lack of work. The Policy provision ensures that those laid off will not be discouraged from seeking alternative employment; it does not place appellants [who continued their jobs with the successor company] in the same position as laid off employees who may or may not find jobs.

Id. (quoting Bradwell v. GAF Corp., 954 F.2d 798, 800 (2d Cir. 1992)); see also Garvin, 174 F.3d at 1097 (using the same quotation). Plaintiffs in this case are unlike employees who are laid off but fortunate enough to find employment; plaintiffs did not face "concomitant risks of unemployment or changes in job duties and benefits." Garvin, 174 F.3d at 1097. Thus, "[w]hile unemployment . . . is not always a necessary condition for receipt of severance benefits, it is probable, in the absence of language indicating otherwise, that a severance pay plan is geared to sheltering loyal workers from a precipitous loss of income." Allen, 967 F.2d at 702 (citations omitted).

The extrinsic evidence in this case is sparse. Nonetheless the minimal administrative record supports the Court's determination that the Policy does not provide termination benefits to plaintiffs or their similarly situated co-workers. According to Lorack, before the closing of the Hillcrest/Ardent asset purchase agreement, the Hillcrest severance plan was reviewed to determine whether the asset sale was a triggering event that would require severance payment to the Hillcrest employees. Hillcrest determined that Hillcrest employees who continued their employment with Ardent, uninterrupted, and with the same or similar position, salary, and benefits, would not be entitled to severance pay. Dkt. # 41, Errata Relating to Hillcrest's Administrative Record, ¶ 6. The fact that Hillcrest believed that it did not have to pay employees like plaintiffs severance pay undermines plaintiffs' argument that Hillcrest took into account the payment of such benefits in establishing the purchase price. Dkt. # 47, at 13-14. Additionally, in Lorack's letter to Kaltenbacher, he implied that Kaltenbacher would not receive severance pay because "Ardent will not be terminating [his] employment in connection with the upcoming transaction." Dkt. # 34, Ex. 5.

Thus, the evidence suggests that Hillcrest did not intend the Policy to provide plaintiffs with termination benefits given their continued and uninterrupted employment at Ardent.[3]

### IV.

In sum, the Policy must be accorded its natural construction and interpreted to comport with the general purpose of the severance plan. The Court determines that the Policy is, on its face, ambiguous. Since the root purpose of severance plans is to provide employees with unemployment benefits and not bonus payments on termination, the Court will not impute the award of severance pay in this case "absent some clear indication to that effect in the documents." Headrick, 24 F.3d at 1277. There is no "clear indication" that plaintiffs are entitled to severance pay; therefore, the Court denies plaintiffs request for severance pay.

**IT IS THEREFORE ORDERED** that plaintiffs' request that the Court award them severance pay (Dkt. # 44) is **denied**. A separate judgment for defendant is entered herewith.

**DATED** this 19th day of October, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[3] Naturally, Hillcrest and its executives, such as Lorack, were inclined to read the Policy in a manner that would minimize its costs associated with the sale of assets. Thus, the Court will not place too much weight on Hillcrest's intent in and around the time of the asset sale. The Court focuses its attention on the Policy itself and the purpose of severance plans in general. It would come to the same conclusion even absent Lorack's affidavit.